# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

LINDA LOUDENSLAGER, Individually   *
and on Behalf of All Others Similarly   *
Situated,   *
                                       *       CIVIL ACTION NO. 22-1020
Plaintiff,   *
                                       *       SECTION:
VERSUS   *
                                       *       MAGISTRATE JUDGE:
UNILEVER UNITED STATES INC.,   *
                                       *       **JURY TRIAL DEMANDED**
Defendant.   *
                                       *

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## CLASS ACTION COMPLAINT

Plaintiff Linda Loudenslager ("Plaintiff"), individually and on behalf of all others similarly situated (the "Class"), by and through undersigned counsel, files this Class Action Complaint against Defendant Unilever United States, Inc. ("Unilever" or "Defendant"), and in support thereof states the following:

## NATURE OF THE ACTION

1.      This is a class action lawsuit by Plaintiff, on behalf of herself and others similarly situated, who purchased and used Unilever dry shampoo products. Defendant distributes, markets and sells these dry shampoo products over-the-counter under various brand names, including Dove, Living Proof, Nexxus, Suave, TIGI (Bed Head and Rockaholic), and TRESemmé (the "Products").[1] An independent laboratory, Valisure, LLC, tested many dry shampoo products,

---

[1] The Unilever Dry Shampoo Products include, but are not limited to the following: 1) **Suave**: Hair Refresher Matte Dry Shampoo, Refresh and Revive Dry Shampoo; 2) **TIGI**: Bed Head Oh Bee Hive Dry Shampoo, Bed Head Dirty Secret, Rockaholic Dirty Secret Dry Shampoo, Rock Dry Shampoo, Catwalk Transforming Dry Shampoo, Revitalizing Dry Shampoo; 3) **Tresemme**: Fresh Clean Dry Shampoo, Dry Shampoo Volumizing, Brunette Clean Dry Shampoo, Volume Clean Dry Shampoo, Pro Pure Dry Shampoo Clean, Between Washes Fresh & Clean Dry Shampoo; 4) **Dove**: Volume and Fullness Dry Shampoo, Unscented Dry Shampoo, Ultra

including Unilever Products, and detected dangerously high levels of benzene—a substance that is widely known and recognized as a human carcinogen. The presence of benzene in the Products ultimately led to a nationwide, but insufficient, recall. Despite knowing of the unacceptable toxicity of benzene, Defendant failed to disclose the presence of benzene in the Products' labels or otherwise make known the presence of the carcinogen in its Products to consumers, in violation of federal and Louisiana law. Plaintiff and the Class suffered economic damages as a result of Defendant's misconduct (as set forth below) and they seek, among other things, injunctive relief and restitution for the full purchase price of the Product(s) they purchased. Plaintiff alleges the following based on personal knowledge, as well as investigation by counsel, and as to all other matters upon information and belief. Plaintiff further believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## JURISDICTION AND VENUE

2.    This Court has diversity jurisdiction pursuant to the Class Action Fairness Act, codified at 28 U.S.C. §§ 1332(d) and 1453, because the putative class consists of at least 100 Class Members; the citizenship of at least one Class Member is different from that of Defendants; and the amount in controversy exceeds $5,000,000, exclusive of interest and costs.

3.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Plaintiff Linda Loudenslager suffered injury as a result of Defendant's acts in this district, Defendant conducts substantial business in this district, Defendant has intentionally availed itself of the laws and markets of this district, and Defendant is subject to personal jurisdiction in this district.

---

Clean Dry Shampoo, Rose Bloom Dry Shampoo, Orange Blossom Dry Shampoo, Invisible Dry Shampoo, Fresh & Floral Dry Shampoo, Fresh Coconut Dry Shampoo, Foam Dry Shampoo, Detox and Purify Dry Shampoo, Care Between Washes Go Active Dry Shampoo Wipes, Care Between Washes Go Active Dry Shampoo, Care Between Washes Clarifying Dry Shampoo, Care Between Washes Brunette Dry Shampoo; 5) **Nexxus**: Nexxus Dry Shampoo Refreshing Mint for Volume; 6) **Living Proof**: Perfect Hair Day Dry Shampoo, Perfect Hari Day Advanced Clean Dry Shampoo (collectively referred to as the "Products").

## THE PARTIES

4.     **Named Plaintiff and Class Representative** Linda Loudenslager ("Plaintiff") is domiciled in Livingston Parish, Louisiana, and at all times relevant hereto has been domiciled in Livingston Parish. Plaintiff purchased and used Defendant's Products, specifically TRESemmé Dry Shampoo Volumizing and TRESemmé Between Washes Dry Shampoo ("TRESemmé Dry Shampoo") and, more recently, Dove Volume and Fullness Dry Shampoo ("Dove Dry Shampoo"), consistently over the last 10 years. Plaintiff purchased the products at Wal-Mart in Denham Springs, Louisiana. Plaintiff avers that she used the TRESemmé Dry Shampoo multiple times per week for a period exceeding five years. Plaintiff more recently purchased and used the Dove Dry Shampoo. When purchasing the TRESemmé and Dove Dry Shampoos, Plaintiff read and reviewed the accompanying labels, disclosures, and safety information, as well as Defendant's advertising claims, and understood them as representations and warranties by the Defendant that the Dry Shampoos were properly manufactured, free from defects, safe for their intended use, and not adulterated or misbranded. Plaintiff relied on these labels, disclosures and advertisements in deciding to purchase the Dry Shampoos, and these representations were part of the basis of the bargain. Plaintiff would not have purchased the products had she known they contained, or had the risk of containing, the highly dangerous carcinogen benzene. As a result, Plaintiff suffered injury in fact when, absent Defendant's misconduct alleged herein, she spent money to purchase products she would not otherwise have purchased.

5.     **Defendant**, Unilever United States, Inc., is a subsidiary of the dual-listed company consisting of Unilever N.V. in Rotterdam, Netherlands and Unilever PLC in London, United Kingdom. Unilever United States, Inc. is a Delaware corporation with its principal place of business at 800 Sylvan Avenue, Englewood Cliffs, New Jersey 07632. Defendant sells dry

3735476v.1

shampoo products throughout the United States, including in the State of Louisiana. Defendant created and/or authorized the false, misleading, and deceptive advertising, packaging, and labeling of the Products. The Products, including those purchased by Plaintiff and the Class, are available at various retail stores throughout the United States, including in the State of Louisiana. Thus, this Defendant avails itself to this Court by way of the fact that it does business in Louisiana.

## FACTUAL ALLEGATIONS

I.     **Defendant's Dry Shampoo Products and its Assurance of its Commitment to Safety.**

6.     Personal care products are a multi-billion-dollar industry.  In 2019 alone, the retail value of personal care products sold in just North America was estimated to be more than $100 billion.  The global market from dry shampoo was estimated to be valued at $3.46 billion in 2019.

7.     Unilever's Products include some of the bestselling brands of dry shampoo on the market.

8.     Consumers have become increasingly concerned with the harmful impact that chemicals and synthetic ingredients in products used by them and their families can have on their bodies. Unilever knows this and seeks to capitalize on consumers' product safety concerns.

9.     Specifically, on its website, Unilever declares: "Product safety is our top priority. Our home and personal care products are used every day by millions of people around the world. People trust us to provide them with products that are safe for them, their families and the environment."[2]

10.     Unilever also states on its website: "At a minimum we ensure our products comply with applicable laws. In several areas we set our standards higher than those required by law. When this happens [,] we also expect our suppliers and partners to meet these standards. Similarly, when

---

[2] https://www.unilever.com/brands/whats-in-our-products/how-do-we-choose-our-ingredients/

we take on a new brand or a new company we work to ensure they meet our standards as soon as possible."[3]

11.    Unilever often combines representations about safety and environmentalism. Under the banner "Safe and sustainable by design: How we build safety and environmental sustainability into every product innovation," Unilever declares on its website (emphasis added):

> "We ensure that our products are safe for consumers and workers and have a positive impact on the environment.
>
> Our Safety and Environmental Assurance Centre's (SEAC) industry-leading safety and environmental sustainability science has been developed and applied in partnership with external experts over many years. We use this science across Unilever, working with our colleagues to **ensure that our products and processes are safe and sustainable by design** and that our purpose-led brands can be confident in the statements they make about product and ingredient safety, health, environmental sustainability and the planet. SEAC scientists work closely with other scientists across Unilever at every stage of a product's life, from discovering and designing new concepts through to fully embedding new technologies in our product innovations and understanding product use and disposal by consumers across the world. By being involved at the very beginning, SEAC scientists can provide essential safety and environmental sustainability guidance throughout the innovation process.
>
> Those partnerships across Unilever allow us to apply t**he best creative, leading-edge science and to truly design safety and sustainability into our products**. This means **new Unilever products and processes are <u>always</u> designed to ensure that they are safe for our consumers to use,** for our workers to make, and for the environment. Such an approach also helps us to identify how to minimize the environmental impacts of our products and manufacturing processes, notably regarding energy, water and waste across their lifecycle."[4]

12.    Unilever underscores that, in fact, it has a team of scientists, known as SEAC, dedicated to safety, health, and environmentalism: "SEAC is a team of industry-leading safety and environmental sustainability scientists. They use the latest techniques, deep scientific expertise

---

[3] *Id.*
[4] https://www.unilever.com/planet-and-society/safety-and-environment/safe-and-sustainable-by-design/

and an evidence-based approach to ensure that **our products are safe for consumers** and workers and better for the environment." (Emphasis added.)

13.    Defendant often makes similar representations regarding the quality and safety of its Products. For example,

    a.    Unilever brand Dove markets, advertises, and otherwise represents to consumers that "When it comes to care, we want to give you products you can trust for your skin and hair . . . We care about how we make our products and what goes into them."[5] The brand asserts that "We *only pick ingredients* that do a job like no other and that we have individually *assessed to be safe*."[6]

    b.    Unilever brand Living Proof markets, advertises, and otherwise represents to consumers that "Living Proof products are bioengineered and developed in the lab using a mix of natural and synthetic ingredients *to ensure maximum* efficacy, *safety*, and performance—all while remaining cruelty free."[7]  Living Proof emphasizes the rigorous testing and science behind its products: "Every single product is rigorously developed and tested at our in-house laboratories in Boston—not too far from our original home at MIT University."[8]

    c.    Unilever brand Nexxus markets, advertises, and otherwise represents to consumers that to "find out what is in Nexxus products," a consumer simply needs to "*check the product label* for details or check the ingredients tab on the individual product pages."[9]

---

[5] *About Dove*, https://www.dove.com/us/en/stories/about-dove.html.
[6] *Ingredients we do use*, https://www.dove.com/us/en/stories/about-dove/ingredients-we-use.html (emphasis added).
[7] *How we formulate*, https://www.livingproof.com/our-science/how-we-formulate.html (emphasis added).
[8] *Our story:*  https://www.livingproof.com/us/en/our-story.html
[9] *Frequently Asked Questions*, https://www.nexxus.com/us/en/faq/ (emphasis added)

d.  Unilever brand Suave markets, advertises, and otherwise represents to consumers that consumers should "[t]rust in our process," and that "[*a]ll Suave formulas are safe to use* and meet the highest global standards in safety and quality."[10] The brand goes on to provide that it conducts "Safety Assessments" on all products, which consist of "a review of what ingredients are used in every formulation and in what quantity. This helps make sure that we only use what is needed to provide safe and effective products."[11] Suave claims that its hair products are made of "select natural ingredients" – "so you can trust we've got the good stuff."[12]

e.  Unilever brand TRESemmé markets, advertises, and otherwise represents to consumers that its product "ingredients…comply with all federal and state laws," and that TRESemmé "only uses what is needed to provide safe and effective products."[12] The brand specifically promises that their "assessments and evaluations prove TRESemmé products are safe to use."[13]  The brand provides the following assurances regarding testing and global safety standards:

> "All TRESemmé formulas are safe to use and meet the highest global safety and quality standards.  Before being selected for our formula, each of our ingredients undergoes an industry-proven, comprehensive safety evaluation by Unilever scientists, who asses data from leading third-party industry organizations, regulators, and out in-house experts.  We rigorously assess all TRESemmé products to ensure all ingredients, manufacturing and labeling comply with applicable laws and regulations all over the world."[14]

Unilever brand Tresemme, showing full awareness of the importance of benzene-free products, states: "TRESemmé does not use benzene as an ingredient in our

---

[10] *Trust in Suave*, https://www.suave.com/us/en/dmdm-hydantoin-products-information.html (emphasis added).
[11] *Id.*
[12] *Trust in TRESemmé*: https://www.tresemme.com/us/en/about-us/facts-on-tresemme-product-ingredient-safety/ (last visited on December , 2022).
[13] *Id.*
[14] *TRESemmé Product & Ingredient Safety FAQ*: https://www.tresemme.com/us/en/about-us/product-ingredient-safety-faq/ (last visited December 5, 2022).

products. Any trace amount of benzene detected in the final products usually occurs due to its natural presence in certain raw materials, and we have strict quality controls in place that limit the presence of benzene and ensure compliance with the highest global safety standards."[15]

14.    Further, Unilever specifically markets, advertises, and otherwise represents to consumers that "Consumers trust us to provide them and their families with high-quality products. *We design and manufacture our products so they're safe for their intended use.*"[16]

15.    All Products, however, fail to disclose the presence, or risk thereof, of benzene, a known highly dangerous carcinogen.

## II.    Defendant's Knowledge of the Presence of Benzene in its Dry Shampoo Products.

16.    Since late 2020, an independent analytical laboratory, ValisureRX, LLC and Valisure LLC ("Valisure"), has been analyzing consumer products for benzene.[17] Through its testing, Valisure first discovered in 2021 that several sunscreen products and antiperspirant and deodorant products contained benzene, several with levels of benzene contamination significantly

---

[15] *Id.*

[16] *Product and safety quality*, https://www.unilever.com/planet-and-society/responsible-business/product-safety-and-quality/ (emphasis added).

[17] *See Valisure Citizen Petition on Benzene in Sunscreen and After-sun Care Products* (May 24, 2021), https://assets-global.website-files.com/6215052733f8bb8fea016220/62728f83d7f91acc8572e9ee_FDA-2021-P-0497-0001_attachment_1.pdf; *Valisure Citizen Petition on Benzene in Body Spray Products* (Nov. 3,2021),https://assetsglobal.websitefiles.com/6215052733f8bb8fea016220/626af96f521a0584e70e50eb_Valisure%20FDA%20Citizen%20Petition%20on%20Body%20Spray%20v4.0%5B260%5D.pdf; *Valisure Citizen Petition on Benzene in Dry Shampoo Products* (Oct. 31, 2022), https://assets-global.websitefiles.com/6215052733f8bb8fea016220/6360f7f49903987d8f4f4309_Valisure%20FDA%20Citizen%20Petition%20on%20Benzene%20in%20Dry%20Shampoo%20Products_103122.pdf.

above 2 parts per million ("ppm").[18] Valisure called on the FDA to take prompt action regarding

its findings, given the potential risk to public safety.[19]

17.    Specifically, on May 25, 2021, Valisure filed a Citizens Petition with the Food and

Drug Administration ("FDA") asking the agency to recall all batches of sunscreen products that

contained 0.1ppm or more of benzene, on the basis that they are adulterated under federal law and

values above 0.1 ppm pose a known risk to human health.[20]

18.    In its sunscreen study released in May 2021, Valisure advised the FDA, as well as

the aerosol manufacturing community, that "the presence of benzene appears to be from

contamination in the identified sunscreen products."[21] Also in July 2021, Valisure's CEO stated in

an interview that the root cause of the benzene contamination would "likely be traced to

contaminated raw materials and that he d[id] not believe that the problem w[as] inherent to aerosol

sunscreens, or sunscreens in general," putting all aerosol manufactures and distributors—including

Defendant—on notice that the problem was not isolated and likely included a broad scope of

aerosol products.[22]

19.    After Valisure's Citizen Petition was filed in May 2021, litigation related to

benzene contamination in sunscreen began immediately, including against Defendant's competitor

Johnson & Johnson ("J&J"). J&J began an internal investigation, and quickly revealed that the

---

[18] *Valisure Citizen Petition on Benzene in Sunscreen and After-sun Care Products* (May 24, 2021), https://assets-global.website-files.com/6215052733f8bb8fea016220/62728f83d7f91acc8572e9ee_FDA-2021-P-0497-0001_attachment_1.pdf; *Valisure Citizen Petition on Benzene in Body Spray Products* (Nov. 3,2021),https://assetsglobal.websitefiles.com/6215052733f8bb8fea016220/626af96f521a0584e70e50eb_Valisure%20FDA%20Citizen%20Petition%20on%20Body%20Spray%20v4.0%5B260%5D.pdf.
[19] *See id.*
[20] https://assets-global.website-files.com/6215052733f8bb8fea016220/62728f83d7f91acc8572e9ee_FDA-2021-P-0497-0001_attachment_1.pdf
[21] *Valisure Detects High Levels of Benzene in Several Dry Shampoo Products and Requests FDA Actions*, https://www.valisure.com/valisure-newsroom/valisure-detects-benzene-in-dry-shampoo.
[22] Michael Erman & Julie Steenhuysen, *FDA investigating how a known carcinogen wound up in J&J sunscreen* (July 16, 2021), https://www.reuters.com/world/us/fda-investigating-how-known-carcinogen-wound-up-jj-sunscreen-2021-07-16/.

source of its products' benzene contamination was the propellant that sprays the product out of the can. Less than two months later, on July 14, 2021, J&J announced it was voluntarily recalling all lots of Neutrogena and Aveeno aerosol sunscreen product lines due to the presence of benzene in samples of the recalled products.[23]

20.     On November 3, 2021, Valisure filed another Citizen Petition with the FDA warning of benzene contamination in various manufacturers' antiperspirant and deodorant products, including Defendant's aerosol products. Through its testing, Valisure discovered that some of the Defendant's aerosol antiperspirant products contained benzene, with values ranging from 0.97 2 to 5.21 ppm in Suave 24 Hour Protection aerosols.[24]

21.     Through its body spray testing and study completed in November 2021, Valisure discovered that products containing butane were at higher risk of having elevated benzene levels and warned that "'propellants' like butane, isobutane, propane, and alcohol are commonly used and could potentially be sources of benzene contamination."[25]

22.     The release of these studies in 2021 led to a plethora of consumer product recalls, putting all aerosol manufacturers on notice that the benzene contamination issue was likely a much broader issue.[26]

---

[23] https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/johnson-johnson-consumer-inc-issues-voluntary-recall-specific-neutrogenar-and-aveeno-aerosol.

[24] https://assets-global.website-files.com/6215052733f8bb8fea016220/626af96f521a0584e70e50eb_Valisure%20FDA%20Citiz en%20Petition%20on%20Body%20Spray%20v4.0%5B260%5D.pdf.

[25] *Valisure Detects High Levels of Known Human Carcinogen Benzene in Several Body Spray Products and Requests FDA Actions* (Nov. 4, 2021), https://www.valisure.com/valisure-newsroom/valisure-detects-benzene-in-body-spray-products.

[26] *See, e.g.*, *Johnson & Johnson Consumer Inc. Issues Voluntary Recall of Specific NEUTROGENA® and AVEENO® Aerosol Sunscreen Products Due to the Presence of Benzene* (July 14, 2021), https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/johnson-johnson-consumer-inc-issues-voluntary-recall-specific-neutrogenar-and-aveenor-aerosol; *P&G Issues Voluntary Recall of Specific Old Spice and Secret Aerosol Spray Antiperspirants and Old Spice Below Deck Aerosol Spray Products Due to Detection of Benzene* (Nov. 23, 2021), https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/pg-issues-voluntary-recall-specific-old-spice-and-secret-aerosol-spray-antiperspirants-and-old-spice.

23.     By December 2021, the FDA advised manufacturers to test for benzene contamination, indicating that the cause of benzene contamination may be related to the propellant isobutane found in aerosols.[27]

24.     In response, Unilever made specific misrepresentations that its products are safe from benzene.

25.     In December 2021, following the discovery of benzene as a specific risk associated with aerosol products, Unilever publicly announced that its products were safe: "Unilever said in an email statement it conducted a 'robust investigation' of its antiperspirants and deodorants and is confident in their safety."[28]

26.     But three months later, on March 30, 2022, Defendant Unilever issued its first voluntary nationwide recall of its Suave 24-hour Protection Aerosol Antiperspirant Powder and Suave 24-Hour Protection Aerosol Antiperspirant Fresh because of "unexpected" "elevated levels of benzene" found in the products.[29] The recall was minimal and only included two products. It specifically indicated that "[n]o other Unilever or Suave products are in the scope of this recall."[30] Unilever acknowledged in the recall that benzene is a "human carcinogen" that "can result in cancers including leukemia and blood cancer of the bone marrow and blood disorders which can be life threatening."[31]

---

[27]  Anna Edney, *FDA tells drugmakers to test for benzene contamination* (Dec. 23, 2021), https://www.bostonglobe.com/2021/12/23/business/fda-tells-drugmakers-test-benzene-contamination/.

[28]  https://www.bloomberg.com/news/articles/2021-12-29/toxins-in-household-products-leave-fda-chasing-a-vapor-trail

[29]  *Unilever Issues Voluntary Nationwide Recall of Suave 24-Hour Protection Aerosol Antiperspirant Powder and Suave 24-Hour Protection Aerosol Antiperspirant Fresh Due to Presence of Slightly Elevated Levels of Benzene*, https://www.unileverusa.com/news/press-releases/2022/unilever-issues-voluntary-nationwide-recall-of-suave-24hour/.

[30]  *Id.*

[31]  *Id.*

27.     Defendant's "internal review" showed that "some samples" of the two antiperspirants contained benzene that "came from the propellant" used in manufacturing the antiperspirants.[32] Upon information and belief, the source of Defendant's contamination and ensuing recall in March 2022 was the same propellant that resulted in J&J's recall that occurred more than nine months earlier. In its recall announcement, however, Defendant does not disclose how many products it tested or what levels of benzene were detected in those products.

28.     Unilever attributed the presence of benzene to the fact that (like Unilever Dry Shampoo Products) these were aerosol spray products, and stated that benzene is not an ingredient: "While benzene is not an ingredient in any of the recalled products, the review showed that unexpected levels of benzene came from the propellant that sprays the product out of the can."[33]

29.     Despite the highly dangerous levels of benzene found in some of its competitors' aerosol products, as well as Unilever's need to recall certain of its own spray deodorant products due to the presence of benzene, Unilever projects that its Products are healthy and safe. In fact, in Unilever's labeling and product packaging, and in its advertising – including on its website and online – Unilever promotes and indeed instructs that the Dry Shampoo Products are not just for occasional use but also for *daily* (and regular, repeated) use.[34]

30.     Unilever claims that its products are safe from benzene, stating on its website: "we have strict quality controls in place that limit the presence of benzene in our products so that any traces found fall within safe levels."[35]

---

[32] https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/unilever-issues-voluntary-nationwide-recall-suave-24-hour-protection-aerosol-antiperspirant-powder.
[33] *Id*.
[34] https://www.suave.com/us/en/products/hair-refresher-dry-shampoo.html;
https://www.livingproof.com/perfect-hair-day/advanced-clean-dry-shampoo/R1024.html
[35] https://www.unilever.com/brands/whats-in-our-products/your-ingredient-questions-answered/controlling-impurities/

31.     Notably, benzene is not a listed ingredient on the labels, product packaging, or on marketing or promotional materials or on-line advertising for any of the Unilever Dry Shampoo Products manufactured, distributed, or sold by Unilever.

32.     In addition, Unilever's Dry Shampoo Products' packaging and labels (and its marketing and promotional materials) do not warn that Unilever Dry Shampoo Products contain, or have a material risk of containing, benzene, a carcinogenic chemical known to cause cancer in humans.

33.     While Unilever does not warn about the presence of benzene, it does warn about other hazards of using the product, stating boldly and prominently such warnings as: "Flammable until Fully Dry." "Do Not Use Near Heat, Flame or While Smoking Can Cause Serious Injury or Death." "Danger Extremely Flammable."

34.     Plaintiff and the Class are reasonable consumers who do not have the scientific knowledge or wherewithal to independently determine that the Unilever Dry Shampoo Products contained, or were at material risk of containing, benzene or to understand the true nature of the Products' ingredients. Consumers must and do rely on Unilever to provide them with accurate information on the ingredients in the Unilever Dry Shampoo Products, particularly given the products contain or were at material risk of containing, benzene — facts that are material to consumers given its propensity to cause adverse health effects.

35.     The Unilever Dry Shampoo Products' packaging does not identify benzene. Indeed, benzene is not listed in the ingredients section, nor is there any warning about the inclusion (or even potential inclusion) of benzene in the Unilever Dry Shampoo Products. This leads reasonable consumers to believe the Unilever Dry Shampoo Products do not contain benzene.

36.     However, despite the fact that the Unilever Dry Shampoo Products' labeling and ingredient listing do not list benzene, the Unilever Dry Shampoo Products contain, or have a material risk of containing, benzene. And although Valisure's testing results demonstrate that aerosol spray personal care products have a particular risk of containing, benzene, Unilever sold the Products.

37.     Despite Unilever's obligations with respect to manufacturing, marketing, processing, packing, labeling, distribution, and sale described herein, Unilever failed to comply with its common law and state statutory obligations by introducing the Unilever Dry Shampoo Products, which are unsafe and not fit for their intended use and purpose, into the stream of commerce.

38.     Unilever, as the manufacturer, marketer, processor, packer, distributor, and seller of the Unilever Dry Shampoo Products had (and still has) an ongoing duty to ensure the Unilever Dry Shampoo Products did not contain dangerous levels of benzene.

39.     Had Unilever complied with its duties under the law to observe manufacturing, marketing, processing, packing, labeling, and distribution best practices, benzene would not have made its way into the Unilever Dry Shampoo Products.

40.     Further, had Unilever adopted adequate testing procedures to ensure that the products it was introducing into the stream of commerce did not contain dangerous carcinogens such as benzene, it would have discovered that its manufacturing, marketing, processing, packing, labeling, and distribution processes were deficient and would have detected benzene in its products and prevented their introduction into the stream of commerce.

**A.    Unilever's Dry Shampoo Products Have Been Shown to Contain, or Have a Material Risk of Containing, Benzene**

**41.**    In January through May of 2022, Valisure tested Unilever Dry Shampoo Products. The Valisure Results (as set forth herein) show that the Unilever Dry Shampoo Products are contaminated, and have a material risk of being contaminated, with unsafe levels of benzene.

**42.**    On October 31, 2022, Valisure confirmed that dry shampoo contained the dangerous carcinogen benzene. Valisure filed its sixth Citizen Petition with the FDA, alerting the agency that it had detected the highly dangerous benzene in dry shampoo products.[36] Valisure reported that its testing of dry shampoo products from thirty-four brands found that 70% of samples from these brands contained "quantifiable levels of benzene."[37] Valisure warned that "[t]he presence of this known human carcinogen in dry shampoo products that are regularly used indoors and in large volumes makes this finding especially troubling."[38] The study also illustrated that the use of benzene is entirely avoidable—some dry shampoo products tested resulted in levels of benzene that were below the lower limit of quantitation.[39]

**43.**    Valisure tested 36 unique batches of the Unilever Dry Shampoo Products. The results show significant numbers of benzene in the Unilever Dry Shampoo Products. Almost 50% (17) of the 36 Unilever batches tested above 2ppm – the FDA's "strict" limit for *drug* products, and an additional 8 batches tested between the Limit of Quantification that Valisure set at 0.18 ppm to reflect measurable/detectable levels of benzene, and 2ppm, bringing the total

---

[36] *Valisure Citizen Petition on Benzene in Dry Shampoo Products* (Oct. 31, 2022), https://assets-global.websitefiles.com/6215052733f8bb8fea016220/6360f7f49903987d8f4f4309_Valisure%20FDA%20Citizen%20Petition%20on%20Benzene%20in%20Dry%20Shampoo%20Products_103122.pdf.

[37] *Valisure Detects High Levels of Benzene in Several Dry Shampoo Products and Requests FDA Actions* (Nov. 1, 2022), https://www.valisure.com/valisure-newsroom/valisure-detects-benzene-in-dry-shampoo.

[38] *Valisure Citizen Petition on Benzene in Dry Shampoo Products* (Oct. 31, 2022), https://assets-global.websitefiles.com/6215052733f8bb8fea016220/6360f7f49903987d8f4f4309_Valisure%20FDA%20Citizen%20Petition%20on%20Benzene%20in%20Dry%20Shampoo%20Products_103122.pdf.

[39] *Id.*

amount of tested products containing benzene to almost 70% of the batches tested (25 of the 36 batches). Even more startling are the levels of benzene in the Unilever Products tested, which yielded multiple results of 5, 10, 15, 20 and, in one sample, over **31 times** the 2 ppm strict limit set by the FDA for drug products, including ten samples that tested over **10 times** the FDA's level, and fifteen Unilever samples that tested above twice the 2 ppm strict FDA limit. Notably, Unilever Dry Shampoo Products are cosmetic products, *not* drug products, rendering these results even more egregious.

44.    The Valisure Results concerning the Unilever Dry Shampoo Products with detectable levels of benzene, above Valisure 's 0.18 Limit of Quantification, are set forth in the table below:

| Brand | UPC | Lot | Description | Benzene Concentration (PPM) |
|-------|-----|-----|-------------|------------------------------|
| | | | | |
| Tresemme | 022400004495 | 04201KK17 | Tresemme Between Washes Dry Shampoo - Fresh & Clean - 5 oz | 63.3 |
| TIGI | 615908432671 | 0430 1KK07 | TIGI Bed Head Dirty Secret Dry Shampoo - 6.2 oz | 59.3 |
| Suave | 079400391483 | 05141KK09 | Suave Professionals Refresh & Revive Dry Shampoo - 4.3 oz | 47.9 |
| Suave | 079400391483 | 05151KK09 | Suave Professionals Refresh & Revive Dry Shampoo - 4.3 oz | 36.3 |
| TIGI | 615908431285 | 07210KK01 | TIGI Bed Head Oh Bee Hive Volumizing Dry Shampoo - 5 oz | 18 |
| TIGI | 615908432701 | 06110KK01 | TIGI Bed Head Dirty Secret Dry Shampoo - 2.1 oz | 15.2 |
| TIGI | 615908432701 | 0505 1KK08 | TIGI Bed Head Dirty Secret Dry Shampoo - 2.1 oz | 14.5 |
| Dove | 079400449351 | 05201KK74 | Dove Refresh & Revive Care Between Washes Dry Shampoo - Fresh Coconut - 5 oz | 13.4 |
| TIGI | 615908419788 | 06266KK22 | TIGI Bed Head Rockaholic Dirty Secret Dry Shampoo - 6.3 oz | 12.3 |
| Dove | 079400449351 | 06101KK75 | Dove Refresh & Revive Care Between Washes Dry Shampoo - Fresh Coconut - 5 oz | 11.1 |

| | | | | |
|---|---|---|---|---|
| Tresemme | 022400002422 | 08200KK16 | Tresemme Volume Clean Dry Shampoo - Warm Petals - 7.3 oz | 11 |
| Tresemme | 022400005683 | 06031KK07 | Tresemme Pro Pure Dry Shampoo Clean - No Visible Residue - 5 oz | 8.55 |
| TIGI | 615908419788 | 07254KK01 | TIGI Bed Head Rockaholic Dirty Secret Dry Shampoo - 6.3 oz | 6.94 |
| Dove | 079400202444 | 06171KK48 | Dove Refresh & Revive Care Between Washes Dry Shampoo - | 6.26 |
| TIGI | 615908432671 | 07140KK04 | TIGI Bed Head Dirty Secret Dry Shampoo - 6.2 oz | 5.4 |
| Nexxus | 605592646638 | 07300KK05 | Nexxus Dry Shampoo Refreshing Mist With Pearl Extract - 5 oz | 3.17 |
| TIGI | 615908432671 | 07140KK04 | TIGI Bed Head Dirty Secret Dry Shampoo - 6.2 oz | 2.65 |
| Nexxus | 605592646638 | 07300KK05 | Nexxus Dry Shampoo Refreshing Mist With Pearl Extract - 5 oz | 1.4 |
| Tresemme | 022400005256 | 07161KK19 | Tresemme Fresh Clean Dry Shampoo - Fresh Bouquet - 7.3 oz | 1.36 |
| Living proof | 855685006485 | E21096F | Living proof. Perfect hair Day - Dry Shampoo - 4 oz | 0.972 |
| Nexxus | 605592646638 | 02010KK04 | Nexxus Dry Shampoo Refreshing Mist With Pearl Extract - 5 oz | 0.611 |
| Tresemme | 022400005683 | 02210KK03 | Tresemme Pro Pure Dry Shampoo Clean - With 100% Natural Tapioca | 0.561 |
| Living proof | 855685006492 | E21222R | Living proof. Perfect hair Day - Dry Shampoo - 1.8 oz | 0.512 |
| Living proof | 855685006492 | E21223R | Living proof. Perfect hair Day - Dry Shampoo - 1.8 oz | 0.317 |
| TIGI | 615908431285 | 0909 1KK06 | TIGI Bed Head Oh Bee Hive Volumizing Dry Shampoo - 5 oz | 0.184 |

**B.  Unilever Waited More Than a Year After They Had Notice of the Likelihood of Benzene in their Dry Shampoo Products to Act.**

45.    On October 18, 2022, almost one and a half years after Valisure's initial report of benzene contamination in dozens of sunscreen products and its warnings that the propellant being used in these aerosol products was the likely cause of the contamination, and well after the company should have been on notice of the likelihood of benzene in its dry shampoo Products,

17

Unilever issued a voluntary recall of select dry shampoo aerosol products produced prior to October 2021 from Dove, Nexxus, Suave, TIGI, and TRESemmé "due to potentially elevated levels of benzene."[40] This recall was based on "an internal investigation," that identified "propellant as the source [of benzene]."[41] The recall consisted of products distributed nationwide in the United States, including in the State of Louisiana. The nineteen Products impacted by the October 2022 recall are the following:

**Dove**
Dove Dry Shampoo Volume and Fullness
Dove Dry Shampoo Fresh Coconut
Dove Dry Shampoo Fresh and Floral
Dove Dry Shampoo Ultra Clean
Dove Dry Shampoo Invisible
Dove Dry Shampoo Detox and Purify
Dove Dry Shampoo Clarifying Charcoal
Dove Dry Shampoo Go Active

**Nexxus**
Nexxus Dry Shampoo Refreshing Mist
Nexxus Inergy Foam Shampoo

**Suave**
Suave Dry Shampoo Hair Refresher
Suave Professionals Dry Shampoo Refresh and Revive

**TRESemmé**
TRESemmé Dry Shampoo Volumizing
TRESemmé Dry Shampoo Fresh and Clean
TRESemmé Pro Pure Dry Shampoo

**Bed Head (TIGI)**
Bed Head Oh Bee Hive Dry Shampoo
Bed Head Oh Bee Hive Volumizing Dry Shampoo
Bed Head Dirty Secret Dry Shampoo

**Rockaholic (TIGI)**
Bed Head Rockaholic Dirty Secret Dry Shampoo

---

[40] *Unilever Issues Voluntary U.S. Recall of Select Dry Shampoos Due to Potential Presence of Benzene* (Oct. 18, 2022), https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/unilever-issues-voluntary-us-recall-select-dry-shampoos-due-potential-presence-benzene.
[41] *Id.*

46.    Defendant's recall of the Products is not sufficient:

a.    The recall is limited to products purchased *before* October 2021, even though products sold after this date likely continue to be contaminated.

b.    The recall is limited to only certain lots of the Products, without adequate explanation or investigation into whether other lots are contaminated.

c.    In order to be compensated under the recall, consumers are required to have proof of purchase, which is unlikely for a disposable personal care product bought at retail stores over a year ago.  Without proof of purchase, consumers are limited to a cash refund for one product, despite the fact that consumers buy these Products regularly.

d.    Defendant failed to adequately publicize the recall such that consumers were aware of it.

e.    Despite Defendant's assertion that "an internal investigation identified the propellant as the source, and Unilever has worked with its propellant suppliers to address this issue," this does not address that people have already used the product and that Unilever has promised safety from benzene in the past. The fact that this is Unilever's second benzene-related recall in the last year, the promises that they have "addressed" the issue do not ring true.

f.    Defendant makes no effort to disclose how many products it tested, what levels of benzene were detected in those products, how the testing was performed, or when the testing was performed. The failure to disclose such information is unacceptable given the repeated nature of Defendant's misrepresentations and failures.  There is

3735476v.1

"no safe level of benzene" exposure, and the health impacts from exposure can be severe.

**III.    Benzene Is a Known Human Carcinogen with No Safe Exposure Level.**

47.    The major United States source of benzene is petroleum, which is used by many industries to create products and to power machines. The health hazards of benzene have been recognized for more than a century. Benzene was "[f]irst evaluated by IARC in 1974 . . . and was found to be carcinogenic to humans (Group 1), a finding that has stood since that time."[42] As noted by IARC:

> In the current evaluation, the Working Group again confirmed the carcinogenicity of benzene based on *sufficient evidence* of carcinogenicity in humans, *sufficient evidence* of carcinogenicity in experimental animals, and *strong* mechanistic evidence . . . . The Working Group affirmed the strong evidence that benzene is genotoxic, and found that it also exhibits many other key characteristics of carcinogens, including in exposed humans. In particular, benzene is metabolically activated to electrophilic metabolites; induces oxidative stress and associated oxidative damage to DNA; is genotoxic; alters DNA repair or causes genomic instability; is immunosuppressive; alters cell proliferation, cell death, or nutrient supply; and modulates receptor-mediated effects.[43]

48.    The National Toxicology Program ("NTP") listed benzene in its First Annual Report on Carcinogens in 1980 and currently provides that, "[b]enzene is *known to be a human carcinogen* based on sufficient evidence of carcinogenicity from studies in humans."[44]

---

[42] Benzene / IARC Working Group on the Evaluation of Carcinogenic Risks to Humans (2017: Lyon, France), at p. 33.

[43] *Id*. at 34.

[44] NAT'L TOXICOLOGY PROGRAM, *Report on Carcinogens – Benzene* (15th ed.), https://ntp.niehs.nih.gov/ntp/roc/content/profiles/benzene.pdf (emphasis in original).

49.     The United States Center for Disease Control and Prevention ("CDC"),[45] the Environmental Protection Agency ("EPA"),[46] the World Health Organization ("WHO"),[47] and other regulatory agencies have consistently concluded that benzene causes cancer in humans, including leukemia.[48] The WHO has advised that "[h]uman exposure to benzene has been associated with a range of acute and long-term adverse health effects and diseases, including cancer and haematological effects."[49] The CDC warns that "[b]enzene works by causing cells not to work correctly. For example, it can cause bone marrow not to produce enough red blood cells, which can lead to anemia. Also, it can damage the immune system by changing blood levels of antibodies and causing the loss of white blood cells."[50]

50.     Exposure to benzene can occur by inhalation, ingestion, skin absorption, or through skin and/or eye contact.[51] The FDA currently recognizes the danger of benzene exposure and, as a result, advises that the carcinogen "should not be employed in the manufacture of drug substances, excipients, and drug products because of their unacceptable toxicity."[52] The FDA recognizes that "[b]enzene is a carcinogen that can cause cancer in humans"[53] and classifies benzene as a "Class 1" solvent that should be "avoided."[54]

---

[45] *Facts about Benzene*, https://emergency.cdc.gov/agent/benzene/basics/facts.asp.
[46] *Benzene*, https://www.epa.gov/sites/default/files/2016-09/documents/benzene.pdf.
[47] *Chemical Safety and Health*, https://www.who.int/teams/environment-climate-change-and-health/chemical-safety-and-health/health-impacts/chemicals/benzene.
[48] *See Facts about Benzene*, https://emergency.cdc.gov/agent/benzene/basics/facts.asp.
[49] *Chemical Safety and Health*, https://www.who.int/teams/environment-climate-change-and-health/chemical-safety-and-health/health-impacts/chemicals/benzene.
[50] *Facts about Benzene*, https://emergency.cdc.gov/agent/benzene/basics/facts.asp.
[51] CTR. FOR DISEASE CONTROL & PREVENTION, *Benzene*, https://www.cdc.gov/niosh/npg/npgd0049.html.
[52] U.S. FOOD AND DRUG ADMIN., *Q3C – Tables and List; Guidance for Industry* (Aug. 2018), https://www.fda.gov/media/133650/download.
[53] https://www.fda.gov/food/chemicals/questions-and-answers-occurrence-benzene-soft-drinksand-other-beverages#q1.
[54] https://www.fda.gov/media/71737/download.

51.     The FDA has established that "The health consequences of benzene exposure depend on the amount, route, and length of time of exposure."55 The agency noted that even "small amounts" of benzene exposure, such as through inhalation or skin absorption, over extended periods of time "can decrease the formation of blood cells."56

52.     The EPA similarly provides standards for the "Maximum Contaminant Level" [MCL] for drinking water, which the EPA defines as "[t]he highest level of a contaminant that is allowed in drinking water."57 Given its known human carcinogenic risks, the EPA sets the MCL for benzene in drinking water at "zero."58 The WHO similarly warns that "no safe level of exposure [to benzene] can be recommended."59 Consistent with these guidelines, the National Institute for Occupational Safety and Health ("NIOSH") recommends protective equipment be worn by workers expecting to be exposed to benzene at concentrations of 0.1 ppm. NIOSH advises that "inhalation, skin absorption, ingestion, skin and/or eye contact" are exposure routes.60 Individuals have consistently warned about the occupational dangers of benzene.61

53.     In rare circumstances, if a drug product has a "significant therapeutic advance," and the use of benzene is "unavoidable," the FDA restricts the concentration limit of benzene to 2 ppm.[62] Defendant's products, however, do not meet these strict requirements for this safe harbor exception to apply. The Products are *cosmetics*—not drugs—and the use of benzene in the

---

[55] https://www.fda.gov/drugs/drug-safety-and-availability/frequently-asked-questions-benzene-contamination-drugs.
[56] *Id.*.
[57] United States Environmental Protection Agency, 2018 Edition of the Drinking Water Standards and Health Advisories Tables, at p. vi. file:///C:/Users/jrichards/AppData/Local/Microsoft/Windows/INetCache/Content.Outlook/1ADR NMB0/EPA%202018%20Drinking%20Water%20Standards.pdf.
[58] *Id.* at 1.
[59] https://www.euro.who.int/__data/assets/pdf_file/0017/123056/AQG2ndEd_5_2benzene.pdf.
[60] Centers for Disease Control and Prevention. *The National Institute for Occupational Safety and Health (NIOSH), Benzene* (https://www.cdc.gov/niosh/npg/npgd0049.html).
[61] *See* Martyn T. Smith, *Advances in Understanding Benzene Health Effects and Susceptibility*, 31 ANN. REV. PUB. HEALTH 133, 134 (Jan. 4, 2010), https://www.annualreviews.org/doi/pdf/10.1146/annurev.publhealth.012809.103646.
[62] *Id.*

manufacture of the Defendant's Products is not "unavoidable," nor does the use of benzene in the Products provide a "significant therapeutic advance."

54.     As illustrated by Valisure's testing, which showed variation of benzene contamination in the batches of dry shampoos tested, the use of benzene is entirely avoidable in dry shampoo. See Exhibit A. (Valisure Citizen Petition). Some of the dry shampoo products tested by Valisure contained detectible and/or or elevated levels of benzene and some did not.

55.     Further, the Products do not represent a "significant therapeutic advance." Indeed, the FDA has never considered dry shampoo or foam shampoo products as representing a "significant therapeutic advance." Moreover, considering the long history and widespread use of dry shampoo and foam shampoo products, it does not appear that such products constitute a significant therapeutic advance.

56.     Benzene is not listed as an active or inactive ingredient (or otherwise identified as being present) on any of the labels of Defendant's Products. Neither is the use of benzene as an undisclosed "residual solvent" authorized by FDA.[63] This because, as noted above, its use is not "unavoidable" and its use in the Products does not constitute a "significant therapeutic advance." Simply put, benzene is not, and never has been, "authorized" by FDA for use in the manufacture of the Products, either as an ingredient, active ingredient, or residual solvent.

57.     Following Valisure's May 2021 Citizen Petition, the FDA has been working with drug and cosmetic manufacturers on the specific issue of benzene contamination. This work has resulted in the agency issuing an FDA Alert *reminding* manufacturers that they "should not use benzene in the manufacture of drugs."[64] The agency has also worked with numerous manufacturers,

---

[64] https://www.fda.gov/drugs/pharmaceutical-quality-resources/fda-alerts-drug-manufacturers-risk-benzene-contamination-certain-drugs (June 9, 2022).

including Defendant, over the past one and a half years to recall various aerosol products contaminated with benzene. To date, there have been at least eleven product recalls due to the presence of benzene. The FDA's most recent Alert, published June 9, 2022, reaffirms the agency's long-standing position with respect to benzene in drug and cosmetic products, stating that "manufacturers should avoid using benzene in the manufacturing process."[65]  The Alert further notes that this prohibition is consistent with the agency's 2017 guidance document: "Consistent with the recommendations of the ICH Q3 guidance, manufacturers should not use benzene in the manufacture of drugs."[66]

58.     Similar to the FDA's Guidance for Industry Q3C, the FDA's Residual Solvent Guidance on the use of "residual solvents" for drug products (USP General Chapter) provides that, because Class 1 cancer causing agents (like benzene) do not "provide therapeutic benefit," they should be "avoided" absent a showing that their use is "strongly justified" in a risk-benefit analysis. General Chapter 467 provides:

> Because residual solvents do not provide therapeutic benefit, they should be removed, to the extent possible, to meet ingredient and product specifications, good manufacturing practices, or other quality-based requirements. Drug products should contain no higher levels of residual solvents than can be supported by safety data. Solvents that are known to cause unacceptable toxicities (Class 1, Table 1) [e.g., benzene] should be avoided in the production of drug substances, excipients, or drug products unless their use can be strongly justified in a risk-benefit assessment.[67]

59.     Upon information and belief, Defendant has never conducted a "risk benefit assessment" regarding the use of benzene as a residual solvent in its Products, much less "strongly

---

[65]https://www.fda.gov/drugs/pharmaceutical-quality-resources/fda-alerts-drug-manufacturers-risk-benzene-contamination-certain-drugs (June 9, 2022).
[66]https://www.fda.gov/drugs/pharmaceutical-quality-resources/fda-alerts-drug-manufacturers-risk-benzene-contamination-certain-drugs (June 9, 2022); Food and Drug Administration, *Q3C – Tables and List Guidance for Industry* (2017) (https://www.fda.gov/media/71737/download).
[67]    https://www.uspnf.com/sites/default/files/usp_pdf/EN/USPNF/generalChapter467Current.pdf    (USP General Chapter Residual Solvents).

justified" its use before the FDA. Nor is the use of benzene as a residual solvent in manufacturing aerosol antiperspirant products "supported by safety data" in light of the known health risks associated with exposure to benzene as detailed herein.

## IV.   Defendant's Misbranding and Adulteration of Cosmetics.

60.     Unilever's failures described above allowed benzene to be present in the Unilever Dry Shampoo Products. This means the Unilever Dry Shampoo Products are "adulterated" under the FDCA as they contain a "deleterious substance which may render [the Unilever Dry Shampoo Products] injurious to users." 21 U.S.C. §361(a). The Products also are "misbranded" under the FDCA because the Product labels do not disclose the presence of benzene, rendering them "false" and "misleading." 21 U.S.C. §362(a).

61.     Defendants dry shampoo Products are misbranded and adulterated cosmetics. The FDCA defines "cosmetics" as "articles intended to be rubbed, poured, sprinkled, or sprayed on, introduced into, or otherwise applied to the human body . . . for cleansing, beautifying, promoting attractiveness, or altering the appearance[.]" Federal Food, Drug, and Cosmetic Act § 201(i). Louisiana law similarly defines cosmetics.[68] "Cosmetic companies have a legal responsibility for the safety of their products and ingredients."[69]

62.     Federal law and Louisiana law contain parallel statutes with respect to the misbranding and adulteration of cosmetics. Both federal law[70] and Louisiana law[71] prohibit the

---

[68] Louisiana's parallel statute defines cosmetics as "all substances and preparations intended for cleansing, altering the appearance of, or promoting the attractiveness of a person." LA. R.S. § 40:602(2).

[69] https://www.fda.gov/cosmetics/resources-consumers-cosmetics/cosmetics-safety-qa-personal-care-products.

[70] 21 U.S.C. §331(g) ("The following acts and the causing thereof are prohibited: (a) The introductions or delivery for introduction into interstate commerce of any . . . cosmetic that is adulterated or misbranded. (b) The adulteration, or misbranding, of any . . . cosmetic in interstate commerce. (c) The receipt in interstate commerce of any . . . cosmetic that is adulterated or misbranded. . . .").

[71] LA. R.S. § 40:636 (similarly prohibiting the adulteration and misbranding of cosmetics).

manufacturing, sale, or otherwise introduction or receipt of cosmetics in commerce that are

Among the ways a cosmetic may be adulterated are:

> (a) If it bears or contains any poisonous or deleterious substance which may render it injurious to users under the conditions of use prescribed in the labeling thereof, or under such conditions of use as are customary or usual. . . .
>
> (b) If it consists in whole or in part of any filthy, putrid, or decomposed substance.
>
> (c) If it has been prepared, packed, or held under insanitary conditions whereby it may have become contaminated with filth, or whereby it may have been rendered injurious to health.[72]

63.     A cosmetic is misbranded "[i]f its labeling is false or misleading in any particular."[73]

64.     Defendant did not disclose that benzene, a known human carcinogen, is present in the Products purchased by Plaintiff and the Class. As a result of benzene contamination in the Products, they are considered adulterated and misbranded. There is "no safe level of [benzene] exposure" in cosmetics, so it is unsuitable for human application as a dry shampoo or foam shampoo.[74]

65.     Defendant wrongfully advertised and sold the Products without any labeling to indicate to consumers that the Products contain, or have the risk of containing, benzene. The following images are illustrative of the labels contained on the Products purchased by Plaintiff and the Class:

---

[72] 21 U.S.C. §361; *see also* LA. R.S. § 40:621 (similarly defining adulterated cosmetics).
[73] 21 U.S.C. § 362; *see also* LA. R.S. § 40:622 (similarly defining misbranded cosmetics).
[74] https://www.euro.who.int/__data/assets/pdf_file/0017/123056/AQG2ndEd_5_2benzene.pdf.

 

INGREDIENTS: ISOBUTANE, PROPANE, SD ALCOHOL 40-B (ALCOHOL DENAT.), ALUMINUM STARCH OCTENYLSUCCINATE, BUTANE, FRAGRANCE (PARFUM), ISOPROPYL MYRISTATE, SILICA, COCOS NUCIFERA (COCONUT) FRUIT EXTRACT.

66.     In addition, Defendant makes a significant number of representations and/or warranties regarding the safety of the Products on its various websites. For example, and as also addressed in Section I, *supra*, Unilever assures consumers that:

a.   "[w]e design and manufacture our products so they're safe for their intended use"[75];

---

[75]   https://www.unilever.com/planet-and-society/responsible-business/product-safety-and-quality/.  (last  visited  on December 1, 2022).

3735476v.1

b.  it abides by "innovating responsibility, [which] means providing branded products and services that are safe and high quality, and innovating based on sound science"[76];

c.  it has "mandatory policies and standards in place to ensure that we meet our safety and quality commitments"[77];

d.  "we design safety and sustainability into our products and manufacturing processes using the best science available"[78];

e.  "[t]o keep people safe, we conduct two types of consumer safety risk assessment: ingredient safety and microbiological safety"[79];

f.  it "ensure[s] we deliver high-quality, safe and sustainable products every single day to our customers";[80]

g.  "[w]e want consumers to be confident that our products are safe for them and their families"[81];

h.  "we build safety and environmental sustainability into every product innovation"[82];

i.  "[w]e ensure that our products are safe for consumers"[83];

---

[76] *Id.*

[77] *Id.*

[78] *Id.*

[79] https://www.unilever.com/planet-and-society/safety-and-environment/keeping-people-and-the-environment-safe/ (last visited December 1, 2022).

[80] https://www.unilever.com/planet-and-society/responsible-business/product-safety-and-quality/. (last visited December 1, 2022).

[81] *Id.*

[82] https://www.unilever.com/planet-and-society/safety-and-environment/safe-and-sustainable-by-design/. (last visited December 1, 2022).

[83] *Id.*

j.   it incorporates "leading-edge science . . . to truly design safety and sustainability into our products"[84];

k.   "Unilever products and processes are always designed to ensure that they are safe for our consumers to use"[85]; and

l.   it "provid[es] safe high quality products . . . that meet all applicable standards and regulation."[86]

67.    Plaintiff and members of the Class read and relied on one or more of the aforementioned representations in deciding to purchase and use the Products. Plaintiff would not have purchased the Products.

68.    Similarly, Plaintiff and members of the Class read and relied on the Products' labels in deciding to purchase and use the Products. Defendant's omission of the presence of, or the risk of the presence of, benzene on the labels was a material factor in influencing Plaintiff's decision to purchase and use the Products. Plaintiff and the Class would not have purchased and used the Products, or would have paid less for them, had they known that the Products either contain, or have a risk of containing, benzene.

69.    Indeed, no reasonable consumer is going to purchase a dry shampoo product if he or she cannot know whether the product pulled off the shelf is one that is contaminated with a cancer-causing contaminant.

70.    The aforementioned representations and omissions are false and/or misleading because nowhere on the Products' labels (or elsewhere in Defendant's marketing of the Products)

---

[84] *Id.*
[85] *Id.*
[86] *Id.*

does Defendant insinuate, state, or warn consumers that the Products contain, or have a risk of containing, benzene.

71.    Moreover, by virtue of issuing a recall of the Products, Defendant concedes that its Products are mislabeled under federal and Louisiana law, unsafe, and unmerchantable. Defendant represents and/or warrants on its website that:

> Sometimes mistakes can be made in the end-to-end value chain. A product might, for example, have a quality defect. Or there may be a contamination of the raw materials, or a mislabeling of ingredients.
>
> If this happens, protecting consumers' safety is our number one priority. When necessary, we will recall such products from the marketplace.[87]

72.    Thus, by recalling the Products, Defendant admits that it made a "mistake" and that it was "necessary" to recall the Products from the marketplace to "protect consumers' safety" due to the contamination of raw materials and/or mislabeling.

73.    Defendant also represents and/or warrants to consumers that it abides by its "Governance policy" with respect to "Product Safety & Product Quality."[88] In doing so, it represents and/or warrants that "Unilever will take prompt and timely action to recall products or services that don't meet our own high quality standards or those required by the marketplace."[89] Again, by issuing a recall of the Products, Defendant concedes that its Products are not of merchantable quality and do not meet "reasonable consumers'" expectations.

74.    Defendant's conduct is also violative of its representation and/or warranty to take "prompt and timely action to recall" the Products. Defendant waited ten months after Valisure's finding of benzene in similar products to issue its first recall related to benzene contamination and

---

[87] https://www.unilever.com/planet-and-society/responsible-business/product-safety-and-quality/.
[88] https://www.unilever.com/planet-and-society/responsible-business/business-integrity/.
[89] https://www.unilever.com/files/origin/8e705568438b3a2aacb0ca0f6b4166fdbb1b0bd1.pdf/cobp_product-safety-product-quality.pdf.

one and a half years to issue a recall for the Products at issue, even though both recalls were based on the same thing (benzene contamination in aerosol products). By comparison, at least nine other aerosol manufacturers had already issued voluntarily recalls before Defendant decided to recall the Products at issue, the earliest of which was July 2021. The timeline of other recalls is as follows:

- July 2021 – J&J recalls lots of Neutrogena and Aveeno spray sunscreens.

- July 2021 – CVS recalls lots of two sun-care products.

- Sept. 2021 – Biersdorf recalls Pure & Simple Baby, Sport Mineral and Coppertone sprays.

- Oct. 2021 – Bayer recalls Tinactin and Lotrimin antifungal sprays.

- Nov. 2021 – Recall of Odor-Eaters and Stink Stoppers foot sprays.

- Nov. 2021 – Procter & Gamble recalls of Old Spice and Secret antiperspirants.

- Dec. 2021 – P&G recalls Waterless, Pantene, Aussie, Herbal Essences, Old Spice, and Hair Food dry shampoo sprays.

- Feb. 2022 – HRB Brands recalls Sure and Brut sprays.

- **Mar. 2022 – Unilever recalls Suave antiperspirants.**

- July 2022 – Edgewell Personal Care recalls Banana Boat Hair & Scalp sunscreens.

- **Oct. 2022 – Unilever recalls 19 lots of Dove, Nexxus, Suave, TRESemmé, Rockaholic and Bed Head dry shampoos.**

75.     As a result of Unilever's failure to keep benzene out of the Unilever Dry Shampoo Products, millions of consumers, including Plaintiff, have been exposed to dangerous levels of benzene, a known carcinogen, by simply following the directions found on the packaging of the Unilever Dry Shampoo Products.

76.     The Products' labeling fails to disclose that the Unilever Dry Shampoo Products contain benzene. And the absence of this disclosure conveys that benzene is not contained in the Unilever Dry Shampoo Products, which independent third-party testing has shown to be false.

77.     The omission that the Unilever Dry Shampoo Products contain a dangerous carcinogen is a material fact for any consumer item (and for any reasonable consumer), and especially so for a product that typically is used several times per week for years.

78.     Exposure to carcinogens is even more material given that other products that offer the same benefits (*i.e.*, other brands of dry shampoo) are benzene-free.

79.     Therefore, Unilever's false, misleading, and deceptive misrepresentations and omissions regarding the ingredients of the Unilever Dry Shampoo Products are likely to continue to deceive and mislead reasonable consumers and the public, as they have already deceived and misled Plaintiff and Class members.

80.     Unilever's concealment and/or omission was material and intentional because people are concerned with what is in the products that they are putting onto and into their bodies. Consumers such as Plaintiff and Class members are influenced by the ingredients listed and those that are not listed. Unilever knew that if it had not concealed and/or omitted that the Unilever Dry Shampoo Products contained benzene, then Plaintiff and the Class would not have purchased the Unilever Dry Shampoo Products at all.

81.     Plaintiff has standing to represent members of the putative class with respect to the Products they purchased and the Products they did not purchase because there is sufficient similarity between the Products. Specifically, *all* of the Products are marketed in substantially the same way as "dry shampoo" and/or "foam shampoo," and *all* of the Products fail to include labeling indicating to consumers that the Products contain, or may contain, benzene.

82.     Accordingly, the misleading effect of *all* the Products' marketing and labels is substantially the same.

83. Had Plaintiff and members of the putative class known that *any* of the Products were, or could be, contaminated with benzene, they would not have purchased the Products. Thus, Plaintiff and members of the putative class have lost money as a result of Defendant's misrepresentations. Moreover, the decision to purchase or not purchase Products that contain benzene at any level is a financial and healthcare decision that affects the Plaintiff and members of the putative class in a personal and individual way, thus conferring a particularized injury. By failing to disclose the presence, or potential presence, of benzene in its Products, Plaintiff and members of the putative class have been denied the opportunity to make those informed decisions. As a result, Plaintiff and members of the putative class have suffered a particularized injury for purposes of Article III standing.

84. As a sophisticated manufacturer, Unilever knew or should have known of the risk of its product being contaminated with Benzene at least as early as July 2021, when Unilever's top competitors began recalling aerosol products because of the detection of benzene. Moreover, in November 2021, Valisure confirmed the presence of benzene in two of Defendant's own Suave aerosol products.

85. Despite Defendant's knowledge of the pervasive risk of benzene contamination in the Products, Defendant failed to warn consumers of this known danger until October 18, 2022.

86. Further, although Defendants provide ingredients on the Products' labels, Defendant failed to disclose on the Products' labeling or elsewhere in Defendants' marketing that the product actually contained, or had the risk of containing, benzene.

87. Defendant avoided and delayed alerting its consumers about the dangerous risk of its Products containing benzene and instead continued to garner profits from its Products from unsuspecting consumers. Plaintiff and the Class read and relied on one or more of the

aforementioned representations and/or labels in deciding to purchase and use these Products. Plaintiff and the Class would not have purchased and used the Products had Plaintiff and the Class known that the Products contain, or have a risk of containing, benzene.

88.    Plaintiff and the Class members bargained for dry shampoo products that conformed with their labels and did not contain dangerous levels of carcinogens such as benzene. Plaintiff were deprived of the benefit of the bargain when they received the Unilever Dry Shampoo Products, which contained or had a material risk of containing dangerous levels of benzene in them. Plaintiff and the Class members are thus entitled to full or partial refunds for the amounts paid for the Unilever Dry Shampoo Products they purchased on the basis that they have been deprived of the benefit of their bargain.

## TOLLING AND ESTOPPEL

### I.    Discovery Rule Tolling

89.    Plaintiff and the members of the Class and Subclasses had no way of knowing about Unilever's conduct with respect to the presence of carcinogenic benzene.

90.    Neither Plaintiff nor any other members of the Class or Subclasses, through the exercise of reasonable diligence, could have discovered the conduct alleged herein. Further, Plaintiff and members of the Class and Subclasses did not discover (and could not have discovered) and did not know of facts that would have caused a reasonable person to suspect that Unilever was engaged in the conduct alleged herein.

91.    For these, reasons, all applicable statutes of limitation/prescriptive periods have been tolled by discovery rule with respect to claims asserted by Plaintiff and members of the Class, and the Subclasses.

## II.     Fraudulent Concealment Tolling

92.     By failing to provide notice of the presence of carcinogenic benzene in the Unilever Dry Shampoo Products, Unilever concealed its conduct and the existence of the claims asserted herein from Plaintiff and the members of the Class and Subclasses.

93.     Upon information and belief, Unilever intended its acts to conceal the facts and claims from Plaintiff and members of the Class and Subclasses. Plaintiff and the members of the Class and Subclasses were unaware of the facts alleged herein without any fault or lack of diligence on their part and could not have reasonably discovered Unilever's conduct. For this reason, any statute of limitations that otherwise may apply to the claims of Plaintiff or members of the Class or Subclasses should be tolled.

## III.     Estoppel

94.     Unilever was under a continuous duty to disclose to Plaintiff and the members of the Class the risks of consuming the Unilever Dry Shampoo Products.

95.     Unilever knowingly, affirmatively, and actively concealed or recklessly disregarded the true risks of consuming the Unilever Dry Shampoo Products and led consumers to believe they were safe and suitable for consumption.

96.     Accordingly, Unilever is estopped from relying on any statutes of limitations in defense of this action.

## CLASS ALLEGATIONS

97.     Plaintiff brings this action on behalf of herself and all other similarly situated class members (the "Class") pursuant to Rule 23(a), (b)(2), and (3), and (c)4. of the Federal Rules of Civil Procedure and seeks certification of the following class against Defendant for violations of Louisiana state laws and/or similar laws in other states:

**Nationwide Class**

All consumers who purchased, for personal use and consumption, any Unilever dry shampoo product in the United States of America and/or its territories within the applicable statute of limitations.

Excluded from the Class are individuals who allege personal bodily injury resulting from the use of any Unilever dry shampoo product. Also excluded from this Class is Defendant, any parent companies, subsidiaries, and/or affiliates, officers, directors, legal representatives, employees, co-conspirators, all governmental entities, and any judge, justice, or judicial officer presiding over this matter.

98.     In the alternative, Plaintiff brings this action on behalf of herself and all other similarly situated Louisiana consumers pursuant to Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure and seeks certification of the following Sub-Class:

**Louisiana Sub-Class**

All consumers who purchased, for personal use and consumption, any Unilever dry shampoo product in the State of Louisiana within the applicable statute of limitations.

Excluded from the Class are individuals who allege personal bodily injury resulting from the use of Unilever dry shampoo products. Also excluded from this Class is Defendant, any parent companies, subsidiaries, and/or affiliates, officers, directors, legal representatives, employees, co-conspirators, all governmental entities, and any judge, justice, or judicial officer presiding over this matter.

99.     **Numerosity.** Members of the Class are so numerous that joinder is impracticable. Plaintiff does not know the exact size of the Class but believes that there are at least thousands of class members who have been damaged by Defendant's conduct as alleged herein. As such, a class action is superior to other methods of adjudication due to its capacity for efficiency and its preservation of judicial economy, more specifically.

100.    **Typicality.** Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff and all members of the Class were damaged by the same wrongful conduct of Defendants.

101.    Plaintiff will fairly and adequately protect and represent the interests of the Class. The interests of Plaintiff are coincident with, and not antagonistic to, those of the Class. Accordingly, by proving their own claims, Plaintiff will prove other class members' claims as well.

102.    **Adequacy of Representation.** Plaintiff and their counsel will fairly and adequately protect and represent the interests of each member of the Class. Plaintiff has retained counsel experienced in complex litigation and class actions. Plaintiff's counsel has successfully litigated other class action cases similar to those here and have the resources and abilities to fully litigate and protect the interests of the Class. Plaintiff and her counsel are committed to vigorously prosecuting this action on behalf of the members of the Class and Subclasses. Neither Plaintiff nor Plaintiff's counsel have any interest adverse to those of the other members of the Class and Subclasses. Plaintiff has no adverse or antagonistic interests to those of the Class, nor is Plaintiff subject to any unique defenses.

103.    **Commonality and Superiority.** Plaintiff's claims raise questions of law and fact common to all members of the Class, and they predominate over any questions affecting only individual Class members. The claims of Plaintiff and all Class members involve the same alleged defect. These common legal and factual questions include the following:

a.    whether the Unilever Dry Shampoo Products contain, or had a material risk of containing, benzene;

b.    whether Unilever knew of should have known that the Unilever Dry Shampoo Products contained, or had a material risk of containing, benzene;

c.      whether Unilever had a duty to disclose, and wrongfully failed to disclose, that the Unilever Dry Shampoo Products contained, or had a material risk of containing, benzene;

d.      whether Unilever misrepresented material facts and/or failed to disclose materials facts in connection with the manufacturing, packaging, labeling, marketing, distribution, and sale of the Unilever Dry Shampoo Products;

e.      whether Unilever's representations and omissions on the labeling of the Unilever Dry Shampoo Products are likely to mislead, deceive, confuse or confound consumers acting reasonably;

f.      whether Unilever represents to consumers that the Unilever Dry Shampoo Products have characteristics, benefits, or qualities that they do not have;

g.      whether Unilever had inadequate testing and safety standards, and had a duty to disclose, and wrongfully failed to disclose same;

h.      whether Unilever had knowledge that its representations and/or omissions were false, deceptive, and/or misleading;

i.      whether Unilever continues to make representations and/or omissions despite knowledge that the representations and/or omissions are false, deceptive, and/or misleading;

j.      whether Unilever breached its express warranties;

k.      whether Unilever breached its implied warranties;

l.      whether Unilever engaged in fraudulent, deceptive, misleading, unlawful, and/or unfair trade practices;

m.      whether Unilever engaged in false advertising;

38

n.      whether Unilever made negligent and/or fraudulent misrepresentations and/or omissions;

o.      whether Plaintiff and the members of the Class and Subclasses are entitled to actual, statutory, and punitive damages;

p.      whether Unilever unjustly retained a benefit such that restitution is appropriate; and

q.      whether Plaintiff and members of the Class and Subclasses are entitled to declaratory and injunctive relief.

**104.**   A class action is superior to the other available methods for a fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by the Plaintiff and individual Class members is relatively small compared to the burden and expense that would be entailed by individual litigation of their claims against Defendant. It would thus be virtually impossible for Plaintiff and Class members, on an individual basis, to obtain effective redress for the wrongs done to them. Further, it is desirable to concentrate the litigation of the Class members' claims in one forum, as it will conserve party and judicial resources and facilitate the consistency of adjudications. Plaintiff knows of no difficulty that would be encountered in the management of this case that would preclude its maintenance as a class action.

**105.**   The Class also may be certified because Defendant has acted or refused to act on grounds applicable to the Class, thereby making appropriate final declaratory and/or injunctive relief with respect to the members of the Class as a whole.

**106.**   Plaintiff seeks preliminary and permanent injunctive and equitable relief on behalf of the entire Class, on grounds generally applicable to the entire Class, to enjoin and prevent Defendant from engaging in the acts described above, such as continuing to market and sell

Products that are adulterated with benzene, and requiring Defendant to provide a full refund of the purchase price of the Products to Plaintiff and Class members.

107.    Unless a class is certified, Defendant will retain monies received as a result of their conduct that were taken from Plaintiff and the Class members. Unless a Class-wide injunction is issued, Defendant will continue to commit the violations alleged and the members of the Class and the general public will continue to be misled.

108.    Class certification, therefore, is appropriate under Fed. R. Civ. P. 23(b)(3) because the above common questions of law or fact predominate over any questions affecting individual members of the Class, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

109.    Class certification is also appropriate under Fed. R. Civ. P. 23(b)(2) because Unilever acted or refused to act on grounds generally applicable to the Class and Subclasses, so that final injunctive relief or corresponding declaratory relief is appropriate as to the Class and Subclasses as a whole.

110.    In the alternative, the common questions of fact and law, *supra*, are appropriate for issue certification on behalf of the proposed Class and Subclasses under Fed. R. Civ. P. 23(c)(4).

111.    Plaintiff reserve the right to revise the foregoing class allegations and definitions based on facts learned and legal developments following additional investigation, discovery, or otherwise.

## **FIRST CAUSE OF ACTION**

### VIOLATIONS OF THE LOUISIANA UNFAIR TRADE PRACTICES ACT ("LUTPA"), LA. R.S. § 51:1401 *ET SEQ.*
**Against Defendant on Behalf of Plaintiff, Individually**

112.    Plaintiff incorporates all of the above allegations of fact, as if they were asserted within this Cause of Action.

40

113.    Specifically, Plaintiff reiterates that Defendant engaged in numerous specific representations regarding the safety of the Products, as detailed above, as well as omissions of disclosure about the presence, or potential presence, of benzene in the Products.

114.    These representations and omissions were knowing and intentional, as Defendant had knowledge, or alternatively should have had knowledge, of the presence or potential presence of benzene in the Products through the use of contaminated aerosol propellants, for many months (as specifically alleged above) prior to voluntarily recalling the Products.

115.    Plaintiff has suffered an ascertainable loss of money due to the knowing and intentional representations of safety and omission of disclosure of the actual or potential benzene contamination of the Products, which Products Plaintiff would not have purchased had those representations and omissions not occurred.

116.    Pursuant to LUTPA, Plaintiff is entitled to recover her actual damages incurred as a result of Defendant's misrepresentations and omissions of necessary disclosures, as well as her reasonable attorneys' fees and costs.

## SECOND CAUSE OF ACTION

### BREACH OF EXPRESS WARRANTY
### Against Defendant on Behalf of the Class or, Alternatively, the Subclass

117.    Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as set forth herein.

118.     Unilever manufactured, distributed, packaged, labeled, marketed, and sold the Unilever Dry Shampoo Products into the stream of commerce with the intent that the Unilever Dry Shampoo Products would be purchased by Plaintiff and the Class and Subclasses.

119.     Unilever expressly warranted, advertised, and represented to Plaintiff and the Class and Subclasses that the Unilever Dry Shampoo Products were safe and appropriate for human use.

120.     Unilever made these express warranties regarding the Unilever Dry Shampoo Products' quality and fitness for use in writing through its website, advertisements, and marketing materials and on the Unilever Dry Shampoo Products' packaging and labels. These express warranties became part of the basis of the bargain that Plaintiff and the Class and Subclasses entered into upon purchasing the Unilever Dry Shampoo Products. These affirmations of fact and/or promises became part of the basis of the bargain, and the contract, that Plaintiff and the Class and Subclasses entered into with Unilever upon purchasing the Unilever Dry Shampoo Products.

121.     Unilever's advertisements, warranties, and representations were made in connection with the sale of the Unilever Dry Shampoo Products to Plaintiff, the Class, and the Subclasses. Plaintiff, the Class, and Subclasses relied on Unilever's advertisements, warranties, and representations regarding the Unilever Dry Shampoo Products in deciding whether to purchase Unilever's products.

122.     Unilever's Products do not conform to Unilever's affirmations of fact and promises in that they are not safe, healthy, and appropriate for human use.

123.     Unilever therefore breached its express warranties by placing Products into the stream of commerce and selling them to consumers, when their use had dangerous effects and was unsafe, rendering these products unfit for their intended use and purpose, and unsafe and unsuitable for consumer use as marketed by Unilever. These associated health effects substantially impair the use, value, and safety of the Unilever Dry Shampoo Products.

124.    Unilever was aware, or should have been aware, of the presence of the human carcinogen benzene in the Unilever Dry Shampoo Products and therefore was aware or should have been aware of the toxic or dangerous health effects of the use of the Unilever Dry Shampoo Products, but nowhere on the package labeling on Unilever's websites, or other marketing materials did Unilever warn Plaintiff and members of the Class and Subclasses of the presence of benzene, or of the material risk of benzene, in the Unilever Dry Shampoo Products or the dangers it posed.

125.    Instead, Unilever concealed the presence of benzene in the Unilever Dry Shampoo Products and deceptively represented that the Unilever Dry Shampoo Products were safe, healthy, and appropriate for human use. Unilever thus utterly failed to ensure that the material representations it was making to consumers were true.

126.    Benzene was present in the Unilever Dry Shampoo Products when they left Unilever's possession or control and were sold to Plaintiff, members of the Class and Subclasses. The dangers associated with use of the Unilever Dry Shampoo Products were undiscoverable by

127.    Plaintiff, members of the Class and Subclasses at the time of purchase of the Unilever Dry Shampoo Products.

128.    Unilever is the manufacturer, marketer, advertiser, distributor, labeler, and seller of the Unilever Dry Shampoo Products and thus had exclusive knowledge and notice of the fact that the Unilever Dry Shampoo Products did not conform to the affirmations of fact and promises.

129.    In addition, or in the alternative, to the formation of an express contract, Unilever made each of the above-described representations to induce Plaintiff and members of the Class and Subclasses to rely on such representations.

130.     Unilever's affirmations of fact and promises were material, and Plaintiff and members of the Class and Subclasses reasonably relied upon such representations in purchasing the Unilever Dry Shampoo Products.

131.     All conditions precedent to Unilever's liability for its breach of express warranty have been performed by Plaintiff or members of the Class or Subclasses.

132.     Affording Unilever an opportunity to cure its breaches of written warranties would be unnecessary and futile here. Unilever had ample opportunity to test its products for benzene and to modify its manufacturing processes to ensure benzene was not present in the Unilever Dry Shampoo Products to make them safe and healthy for use by Plaintiff and members of the Class and Subclasses.

133.     Unilever's deficient recall did not properly or sufficiently address its failures or remedy the harm suffered by the Class and Subclasses.

134.     As a direct and proximate result of Unilever's breaches of express warranty, Plaintiff and members of the Class and Subclasses have been damaged because they did not receive the products as specifically warranted by Unilever. Plaintiff and members of the Class and Subclasses did not receive the benefit of the bargain and suffered damages at the point of sale stemming from their payment and/or overpayment for the Unilever Dry Shampoo Products.

135.     Plaintiff and the Class and Subclasses seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available thereunder for Unilever's failure to deliver goods conforming to their express warranties and resulting breach.

## THIRD CAUSE OF ACTION

### BREACH OF IMPLIED WARRANTY
### On Behalf of the Class or, Alternatively, the Subclasses

136.    Plaintiff incorporate the foregoing allegations as if fully set forth herein.

137.    Plaintiff bring this claim individually and on behalf of the members of the proposed Class and Subclass against Unilever for breach of implied warranty of merchantability.

138.    Unilever is a merchant, manufacturer, marketer, warrantor, and seller of goods – the Unilever Dry Shampoo Products – to Plaintiff and the Class and Subclasses and knew or had reason to know of the specific use for which the Unilever Dry Shampoo Products were purchased.

139.    Plaintiff and the proposed Class and Subclass are consumers who purchased the Unilever Dry Shampoo Products manufactured, sold, and marketed by Unilever throughout the United States.

140.    An implied warranty that the Unilever Dry Shampoo Products were merchantable arose by operation of law as part of the sale of the Unilever Dry Shampoo Products. At all times mentioned herein, Unilever manufactured, distributed, or supplied Products, and prior to the time the Unilever Dry Shampoo Products were purchased by Plaintiff and the Class and Subclasses, Unilever impliedly warranted to them that the Unilever Dry Shampoo Products were of merchantable quality, fit for their ordinary and intended use, and conformed to the promises and affirmations of fact made on the Unilever Dry Shampoo Products' labels and packaging, including that the Unilever Dry Shampoo Products were safe and appropriate for human use. Plaintiff and the Class and Subclasses relied on Unilever's promises and affirmations of fact when they purchased the Unilever Dry Shampoo Products.

**141.** Benzene existed in the Unilever Dry Shampoo Products when the Unilever Dry Shampoo Products left Unilever's possession or control and were sold to Plaintiff and members of the proposed Class and Subclasses. The presence of benzene in the Unilever Dry Shampoo Products was undiscoverable by Plaintiff and members of the proposed Class and Subclasses at the time of their purchases.

**142.** Contrary to these representations and warranties, the Unilever Dry Shampoo Products were not merchantable or reasonably fit for either the use they were intended or the uses reasonably foreseeable by Unilever and did not conform to Unilever's affirmations of fact and promises as use of the Unilever Dry Shampoo Products was accompanied by the risk of exposure to benzene and to developing benzene-caused cancers, which does not conform to the packaging.

**143.** Unilever breached its implied warranties by selling Products that failed to conform to the promises or affirmations of fact made on the packaging or label as use of each Product was accompanied by the risk of exposure to benzene and to developing benzene-caused cancers, which does not conform to the packaging, rendering the Unilever Dry Shampoo Products unfit for their intended use and purpose and impairing the use, value, and safety of the Unilever Dry Shampoo Products. Unilever had, and has, exclusive knowledge of the material facts concerning the defective nature of the Unilever Dry Shampoo Products.

**144.** Unilever was, or should have been, on notice of this breach, as it was on notice that the process used to manufacture the Unilever Dry Shampoo Products was likely to result in the presence of benzene in the Unilever Dry Shampoo Products.

**145.** Privity exists because Unilever impliedly warranted to Plaintiff and the Class and Subclasses through the warranting, packaging, advertising, marketing, and labeling that

Products were natural, and suitable for use and made no mention of the attendant health risks associated with use of the Unilever Dry Shampoo Products.

146.     Furthermore, Plaintiff and members of the proposed Class and Subclasses were at all material times the intended third-party beneficiaries of Unilever and its agents in the distribution of the sale of its Products. Unilever exercises substantial control over the outlets that sell the Unilever Dry Shampoo Products, which are the same means by which Plaintiff and members of the proposed Class and Subclasses purchased the Unilever Dry Shampoo Products. Unilever's warranties are not intended to apply to distributors but are instead intended to apply to consumers, including Plaintiff and the proposed Class and Subclasses, to whom Unilever directly markets through labels and product packaging, and who review the labels and product packaging in connection with their purchases. As a result, the warranties are designed and intended to benefit the consumers, including Plaintiff and the proposed Class and Subclasses, who purchase the Unilever Dry Shampoo Products. Privity therefore exists based on the foregoing and because Unilever impliedly warranted to Plaintiff and the proposed Class and Subclasses through the packaging that the Unilever Dry Shampoo Products were safe and suitable for human use.

147.     As a direct and proximate result of Unilever's conduct, Plaintiff, the Class, and the Subclasses have suffered actual damages in that each of the Unilever Dry Shampoo Products they purchased is worth less than the price they paid and/or that they would not have purchased at all if they had known of the attendant health risks associated with the use of each of the Unilever Dry Shampoo Products.

3735476v.1

**148.**     Plaintiff, the Class, and the Subclasses seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available thereunder for Unilever's failure to deliver goods conforming to their implied warranties and resulting breach.

## FOURTH CAUSE OF ACTION

### INADEQUATE WARNING
**Against Defendant on Behalf of the Class or, Alternatively, the Subclass**

**149.**     Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as set forth herein.

**150.**     Defendant knew, or should have known, that its Products contain or may contain benzene, a known human carcinogen.

**151.**     Defendant's product contained, or had the risk of containing, benzene at the time the Products left Defendant's control.

**152.**     Defendant had a duty to warn Plaintiff and the Class about the presence of benzene in its Products, which was a dangerous characteristic.

**153.**     Defendant knew that the risk of exposure to benzene from use of its Products was not readily obvious to an ordinary, reasonable consumer, including Plaintiff and members of the Class, and that ordinary consumers would not, and realistically could not, inspect the product for the presence of benzene.

**154.**     Defendant had the ability to provide a warning prior to October 18, 2022, given Defendant's scientific and technological knowledge at the time. Further, despite Defendant's recall on October 18, 2022, they have yet to provide a sufficient warning due to their failure to provide information about what Products were tested, how the Products were tested, when the Products were testing, and the findings of those tests, including the levels of benzene found.

155.    The packaging and labels of the Products has likewise not been altered to provide adequate warning of the potential dangers of benzene exposure.

156.    Plaintiff and the Class sustained damages proximately caused by Defendant because Defendant failed to adequately warn its consumers.

## FIFTH CAUSE OF ACTION

### FRAUDULENT MISREPRESENTATION
### On Behalf of the Class or, Alternatively, the Subclasses

157.    Plaintiff incorporate the foregoing allegations as if fully set forth herein.

158.    Plaintiff bring this claim individually and on behalf of the members of the proposed Class and Subclasses against Unilever for fraudulent misrepresentation.

159.    Unilever falsely represented to Plaintiff, the Class, and the Subclasses that the Unilever Dry Shampoo Products did not contain unsafe levels of carcinogens and were safe for human use. The Products, however, contained, or had a significant risk of containing, the carcinogenic benzene, which does not conform to the packaging. Therefore, Unilever has made misrepresentations about the Unilever Dry Shampoo Products.

160.    Unilever's misrepresentations regarding the Unilever Dry Shampoo Products are material to a reasonable consumer because they relate to the safety, quality, and cancer-causing properties of the Unilever Dry Shampoo Products. A reasonable consumer would attach importance to such representations and would be induced to act thereon in deciding whether or not to purchase the Unilever Dry Shampoo Products.

161.    Unilever intentionally, knowingly, and recklessly made these misrepresentations to induce Plaintiff, the Class, and the Subclasses to purchase the Unilever Dry Shampoo Products.

162.    Unilever knew that its representations about the Unilever Dry Shampoo Products were false, or that there was a significant likelihood that they were false, in that the Unilever Dry

Shampoo Products either did contain, or had a significant risk of containing, unsafe amounts of the carcinogen benzene, which does not conform to the Unilever Dry Shampoo Products' labels, packaging, advertising, and statements. Unilever knowingly allowed its packaging, labels, advertisements, promotional materials, and web sites to intentionally mislead consumers, such as Plaintiff, the Class, and the Subclasses.

163.    Plaintiff, the Class, and the Subclasses did in fact rely on these misrepresentations and purchased Products to their detriment. Given the deceptive way Unilever advertised, represented, and otherwise promoted the Unilever Dry Shampoo Products, the reliance Plaintiff, the Class, and the Subclasses placed on Unilever's misrepresentations was justifiable.

164.    As a direct and proximate result of Unilever's conduct, Plaintiff, the Class, and the Subclasses have suffered actual damages in that they purchased Products that were worth less than the price they paid and/or that they would not have purchased at all had they known of the risk of the presence of unsafe levels of benzene in the Unilever Dry Shampoo Products and the health risks, including cancer, associated with the use of the Unilever Dry Shampoo Products that does not conform with the Unilever Dry Shampoo Products' labels, packaging, advertising, and statements.

165.    Plaintiff, the Class, and the Subclasses seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

## SIXTH CAUSE OF ACTION

### FRAUD BY OMISSION
### On Behalf of the Class or, Alternatively, the Subclasses

166.    Plaintiff incorporate the foregoing allegations as if fully set forth herein.

167.    Plaintiff bring this claim individually and on behalf of the members of the proposed Class and Subclass against Unilever for fraud by omission.

168.    Unilever actively and knowingly concealed from and failed to disclose to Plaintiff, the Class, and the Subclasses that use of Products is accompanied by a risk of exposure to the carcinogen benzene, which carries with it the risk of developing benzene-caused cancers and which does not conform to the Unilever Dry Shampoo Products' labels, packaging, advertising, and statements.

169.    Unilever was under a duty to disclose to Plaintiff, the Class, and the Subclasses the true safety, quality, characteristics, fitness for use, and suitability of the Unilever Dry Shampoo Products because: (1) Unilever was in a superior position to know the true state of facts about its Products; (2) Unilever was in a superior position to know the risks associated with the use of, characteristics of, and suitability of the Unilever Dry Shampoo Products for use by individuals; (3) Unilever knew that Plaintiff, the Class, and the Subclasses could not reasonably have been expected to learn or discover that the Unilever Dry Shampoo Products were misrepresented in the packaging, labels, advertising, and websites prior to purchasing the Unilever Dry Shampoo Products; (4) Unilever's packaging and labels disclosed misleading information to consumers by omitting that the Unilever Dry Shampoo Products contain (or have a material risk of containing) benzene; and (5) based on Unilever's partial statements on the Unilever Dry Shampoo Products' labels and packaging that gave a misleading impression to reasonable consumers that the Unilever Dry Shampoo Products are safe and suitable for use, without further information on the presence of, and material risk of, benzene that had not been disclosed, Unilever assumed the obligation to make a full and fair disclosure of the whole truth.

170.    Unilever knows its customers trust the quality of its products and that they expect the Unilever Dry Shampoo Products to be safe and suitable for use and to not contain or have a risk of containing carcinogenic benzene. Unilever also knows that certain consumers seek out and wish to purchase personal care products that possess high-quality ingredients free of toxins, contaminants, or chemicals, and that these consumers will pay more for those personal care products that they believe possess these qualities.

171.    Due to the omissions on the Unilever Dry Shampoo Products' packaging, Unilever had a duty to disclose the whole truth about the presence, and material risk, of carcinogenic benzene in the Unilever Dry Shampoo Products to Plaintiff and the proposed Class and Subclasses. Unilever failed to discharge its duty to disclose the presence or risk of benzene in the Unilever Dry Shampoo Products.

172.    The facts concealed or not disclosed by Unilever to Plaintiff, the Class, and the Subclasses were material in that a reasonable consumer would have considered them important when deciding whether to purchase the Unilever Dry Shampoo Products.

173.    Plaintiff and the Class and Subclasses justifiably relied on Unilever's omissions to their detriment. The detriment is evident from the true quality, characteristics, and risk associated with the use of Products, which is inferior when compared to how Products are advertised and represented by Unilever.

174.    As a direct and proximate result of Unilever's conduct, Plaintiff, the Class, and the Subclasses have suffered actual damages in that they purchased Products that were worth less than the price they paid and/or that they would not have purchased at all had they known of the health risks associated with the use of the Unilever Dry Shampoo Products which do not conform to the Unilever Dry Shampoo Products' labels, packaging, advertising, and statements.

175.    Plaintiff, the Class, and the Subclasses seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

### SEVENTH CAUSE OF ACTION

**NEGLIGENT MISREPRESENTATION**
**On Behalf of the Class or, Alternatively, the Subclasses**

176.    Plaintiff incorporate the foregoing allegations as if fully set forth herein.

177.    Plaintiff bring this claim individually and on behalf of the members of the proposed Class and Subclasses against Unilever for negligent misrepresentation.

178.    Because Unilever has superior knowledge regarding the quality and safety of its ingredients and products and because Plaintiff and members of the proposed Class and Subclasses trust and rely on Unilever to provide accurate and truthful information regarding the Unilever Dry Shampoo Products, which Plaintiff and members of the proposed Class and Subclasses cannot ascertain on their own, Unilever had a duty to Plaintiff, the Class, and the Subclasses to exercise reasonable and ordinary care in the developing, testing, manufacture, marketing, distribution, and sale of Products.

179.    Unilever breached its duty to Plaintiff, the Class, and the Subclasses by developing, testing, manufacturing, advertising, marketing, distributing, and selling products to Plaintiff, the Class, and the Subclasses that did not have the ingredients, qualities, characteristics, and suitability for use as advertised by Unilever.

180.    Unilever packaged, labeled, marketed, and advertised the Unilever Dry Shampoo Products in a manner indicating that the Unilever Dry Shampoo Products were and are, among other things, safe and suitable for use. However, the Unilever Dry Shampoo Products contained,

or were at risk of containing, carcinogenic benzene, which does not conform to the packaging. Therefore, Unilever has made misrepresentations about the Unilever Dry Shampoo Products.

181.    Unilever's misrepresentations regarding the Unilever Dry Shampoo Products are material to a reasonable consumer because they relate to the ingredients, safety, and quality of the Unilever Dry Shampoo Products, which the consumer is receiving and paying for. A reasonable consumer would attach importance to such representations and would be induced to act thereon in deciding whether or not to purchase the Unilever Dry Shampoo Products.

182.    At all relevant times when such misrepresentations were made, Unilever knew or had been negligent in not knowing that the Unilever Dry Shampoo Products contained, or were at risk of containing, carcinogenic benzene. Unilever has no reasonable grounds for believing its misrepresentations were not false and misleading.

183.    Unilever knew or should have known that the ingredients, qualities, and characteristics of the Unilever Dry Shampoo Products were not as advertised or suitable for their intended use and were otherwise not as warranted and represented by Unilever yet continued selling the Unilever Dry Shampoo Products. Specifically, Unilever knew or should have known that: (1) the manufacturing process used to produce the Unilever Dry Shampoo Products resulted in the presence of benzene in the Unilever Dry Shampoo Products or a substantial risk that benzene would be found in the Unilever Dry Shampoo Products, and (2) the Unilever Dry Shampoo Products were otherwise not as warranted and represented by Unilever.

184.    Unilever intended that Plaintiff and members of the proposed Class and Subclasses would rely on these representations, as evidenced by the intentional and conspicuous placement of the misleading representations on the Unilever Dry Shampoo Products' packaging by Unilever, as

well as its advertising, marketing, and labeling of the Unilever Dry Shampoo Products as, among other things, safe and suitable for use.

185.    Plaintiff and members of the proposed Class and Subclasses have reasonably and justifiably relied on Unilever's negligent misrepresentations when purchasing the Unilever Dry Shampoo Products, and had the correct facts been known, would not have purchased the Unilever Dry Shampoo Products at all, or would have paid less for them.

186.    As a direct and proximate result of Unilever's conduct, Plaintiff, the Class, and the Subclasses have suffered actual damages in that they purchased Products that were worth less than the price they paid and/or that they would not have purchased at all had they known they contained, or had a material risk of containing, the carcinogen benzene that is known to cause the Benzene-caused Cancers which does not conform to the products' labels, packaging, advertising, and statements.

187.    Plaintiff, the Class, and the Subclasses seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available.

## EIGHTH CAUSE OF ACTION

### REDHIBITION
### Against Defendant on Behalf of the Class or, Alternatively, the Subclass

188.    The Plaintiff incorporates all previous allegations of this Complaint as if alleged within this cause of action.

189.    Because the actual or potential presence of benzene in the Products creates an unacceptable risk of exposure to unsafe levels of a Class 1 human carcinogen, Plaintiff's and the Class's use of the Products is so inconvenient that they would not have bought the Products had they known of the benzene contamination.

**190.** The actual or potential presence of benzene in the Products was not known to the Plaintiff or members of the Class prior to their purchase of the Products, nor could benzene contamination have been discovered by a reasonably prudent buyer of the Products.

**191.** The contamination of the Products with benzene existed prior to delivery of the Products to the stores where Plaintiff and members of the Class purchased the Products.

**192.** Accordingly, Defendant is liable to Plaintiff and all others similarly situated for return of the price of the Products, plus interest from the time of purchase, reasonable attorneys' fees, and reimbursement of other reasonable expenses occasioned by the sale of the Products.

## NINTH CAUSE OF ACTION

### UNJUST ENRICHMENT
### Against Defendant on Behalf of the Class or, Alternatively, the Subclass

**193.** Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as set forth herein.

**194.** Alternatively, to the extent that this Court finds that Defendants did not violate the above causes of action, Plaintiff have a claim for unjust enrichment against the Defendants.

**195.** Defendants were unjustly enriched, and Plaintiff was impoverished.

**196.** Plaintiff, the Class, and the Subclasses conferred substantial benefits on Unilever through their purchase and use of Products. Unilever knowingly and willingly accepted and enjoyed these benefits.

**197.** Unilever either knew or should have known that the payments rendered by Plaintiff, the Class, and the Subclasses were given with the expectation that the Unilever Dry Shampoo Products would have the qualities, characteristics, and suitability for use represented and warranted by Unilever. As such, it would be inequitable for Unilever to retain the benefit of the payments under these circumstances when Plaintiff and the proposed Class and

Subclasses did not receive the benefit of the Unilever Dry Shampoo Products for which they bargained.

198.    Unilever's acceptance and retention of these benefits under the circumstances alleged herein make it inequitable for Unilever to retain the benefits without payment of the value to Plaintiff, the Class, and the Subclasses because Unilever's labeling of the Unilever Dry Shampoo Products was misleading to consumers, which caused injuries to Plaintiff and the proposed Class and Subclasses because they would not have purchased the Unilever Dry Shampoo Products or would have paid less for the Unilever Dry Shampoo Products had they known that they contained, or had a material risk of containing, carcinogenic benzene.

199.    As a direct and proximate result, Plaintiff, the Class, and the Subclasses are entitled to recover from Unilever all amounts wrongfully collected and improperly retained by Unilever, plus interest thereon.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, prays for judgment against Unilever as to each count, including:

A.    An order certifying this action as a class action, certifying the Class and Subclasses requested herein, designating Plaintiff as the representatives of the Class and Subclasses, appointing Plaintiff's counsel as counsel to the Class and Subclasses, and requiring Unilever to bear the costs of a class action;

B.    An order declaring that Unilever's actions constitute: (i) breach of express warranty; (ii) breach of the implied warranty of merchantability; (iii) fraudulent misrepresentation; (iv) fraud by omission; (v) negligent misrepresentation; (vi) unjust enrichment; (vii) unfair and deceptive business practices in violation of the identified state

law consumer protection statutes, (viii) a redhibitory defect; and (ix) an inadequate warning, and that Unilever is liable to Plaintiff, members of the Class, and members of the Subclasses, as described herein, for the relief arising therefrom;

C.      An order enjoining Unilever from selling the Products until benzene is eliminated or a full disclosure of the presence of benzene appears on all labels, packaging, and advertising, and requiring Unilever to engage in testing of the Products to measure or detect benzene;

D.      An order awarding declaratory relief, and any further retrospective or prospective injunctive relief permitted by law or equity, including enjoining Unilever from continuing the unlawful practices alleged herein, and injunctive relief to remedy Unilever's past conduct;

E.      A judgment awarding Plaintiff and members of the Class and Subclasses all appropriate economic, monetary, actual, statutory, consequential damages, in an amount to be determined at trial;

F.      A judgment awarding Plaintiff and members of the Class and Subclasses restitution and/or disgorgement of all profits and unjust enrichment that Unilever obtained from Plaintiff and members of the Class and Subclasses as the result of its unlawful, unfair, fraudulent business practices described herein;

G.      A judgment awarding Plaintiff and members of the Class and Subclasses prejudgment and post-judgment interest, as permitted by law;

H.      A judgment awarding Plaintiff and members of the Class and Subclasses punitive damages, as allowed by law;

I.      A judgment awarding Plaintiff and members of the Class and Subclasses costs and fees, including attorneys' fees, as permitted by law; and

J.      For such further relief that the Court may deem just and proper.

# DEMAND FOR JURY TRIAL

**200.**    Plaintiff hereby demands a trial by jury for all claims so triable.


Respectfully submitted,

*/s/E. Blair Schilling*
E. Blair Schilling (La. Bar No. 35308)
bschilling@fishmanhaygood.com
H.S. Bartlett III (La. Bar No. 26795)
tbartlett@fishmanhaygood.com
Carly E. Jonakin (La. Bar No. 40412)
cjonakin@fishmanhaygood.com
FISHMAN HAYGOOD, L.L.P.
201 St. Charles Avenue, 46th Floor
New Orleans, Louisiana 70170
Telephone:  (504) 586-5252
Telecopy:  (504) 586-5250

S. Eliza James (La Bar No. 35182)
eliza@fcjlaw.com
Forrest Cressy and James, LLC
1222 Annunciation Street
New Orleans, Louisiana 70130
Telephone: (504) 605-0777
Telecopy: (504) 322-3884

***Attorneys for Plaintiff and Putative Class and Subclasses***